## COUNTY OF MORGAN *v.* ALLEN.

1. Where a county subscribed to the capital stock of a railway company, and issued its bonds therefor, the creditors of the company, on its becoming insolvent, are entitled to enforce the liability of the county on the bonds which are due and unpaid.
2. The court reaffirms the doctrine announced in *Sawyer* v. *Hoag* (17 Wall. 619) and subsequent cases, that the assets of an insolvent company, including the moneys due from a shareholder on his subscription to its capital stock, constitute a fund for the payment of its creditors, and that he cannot, to their prejudice, be released from his liability by any arrangement between it and him which is not fair and honest and for a valuable consideration. The doctrine is applicable where the debt created by the subscription of a county is evidenced by its bonds, and they were surrendered to it in fraud of the rights of creditors, although the surrender was made pursuant to a consent decree in a suit to which they were not parties.
3. In consideration of the facts and of the decisions of the Supreme Court of

Illinois, in cases involving the same question, the court holds that the subscription by the county court, on behalf of the county of Morgan in that State, to the capital stock of the Illinois River Railroad Company, is valid, and that the bonds, having, by its order and in conformity with the terms of its subscription, been delivered to the company, are binding upon the county, and constitute a part of the assets of the company to which its creditors can resort for payment.

4. The trustees named in a deed of mortgage executed by that company, to secure the holders of its bonds, brought a foreclosure suit, and, under the decree rendered, became the purchasers of the mortgaged property, which they conveyed to a new company chartered by the legislature. In a suit in a State court, to which they were made defendants, they set up that they were entitled to the possession of the county bonds for delivery to the new company. *Held*, that a decree against them does not estop the creditors of the old company, who were secured by that mortgage, from asserting their right to subject the county bonds to the payment of their claims, the proceeds of the sale of the mortgaged property being insufficient for the purpose.

APPEAL from the Circuit Court of the United States for the Southern District of Illinois.

The County Court of Morgan County, in the State of Illinois, at its December Term, 1856, in pursuance of authority conferred by statute (Private Laws Illinois, 1853, p. 53; id., 1854, p. 207), and in accordance with a vote of the people at an election previously held, entered upon its records a subscription, unconditional in form, of the sum of $50,000, payable in bonds of the county, to the capital stock of the Illinois River Railroad Company, a corporation created by the laws of Illinois, with power to construct a railroad from Jacksonville, in Morgan County, *via* the towns or cities of Virginia, Bath, Pekin, and Lacon, to La Salle, in La Salle County. At the same time, by an order of record, authority was given the county judge to act in regard to such subscription as might be necessary, according to the charter, rules, or by-laws of the company, to perfect the same, to represent the county in voting upon the stock, and to provide for the issuing and delivery of the bonds as they might be required.

By an act passed Jan. 29, 1857, the vote taken was declared to have been legally taken, and the county court was required to subscribe the stock and to issue bonds therefor. Shortly thereafter a subscription, unconditional in form, was made by the proper county officers on the books of the company. The

bonds were not issued immediately, and application therefor was made by R. S. Thomas, the president of the company. In order to meet some objections urged against their immediate issue, that officer (upon his own responsibility, so far as the evidence discloses) filed with the county clerk a certificate stating that the part of the railroad north of the town of Virginia was then in process of construction and that the part between Jacksonville and Virginia was "under contract to be completed by the 1st of December, 1858, and that it is provided in the contract for the construction of said road that the Morgan County bonds are to be expended for work done in Morgan County, and not elsewhere." The county court, at its September Term, 1857, thereupon entered of record an order, which, after reciting, among other things, the execution of that certificate, and that the interest and advantage of the county would be promoted by the delivery of the bonds theretofore subscribed, directed "that there be delivered to the Illinois River Railroad Company the amount of $50,000 of the bonds of this county of this date," &c.; also, that the certificate of stock "be deposited with the treasurer of the county for safe keeping," &c.

The bonds were thereupon issued, and deposited by the county judge with Elliott & Brown, bankers, for the railroad company. The evidence is conflicting as to whether the bankers were instructed to hold them until the further order of the county court, or to deliver them to the company upon receiving the certificate of stock for the county. The records of the court indicate an absolute unconditional delivery; and the weight of the evidence supports such a delivery.

In 1859, the bonds still being in the custody of Elliott & Brown, the company gave Allen & McGrady, contractors, two orders for $2,000 each for work done by them outside of Morgan County, but payable on their face in Morgan County bonds. These were subsequently transferred for value to William Thomas.

Vail & Ladd, creditors of the Illinois River Railroad Company, having obtained against it judgments amounting in principal and interest to $7,008.10, and sued out executions which were returned *nulla bona*, instituted garnishee proceedings

to obtain satisfaction of the judgments out of the bonds in the hands of Elliott & Brown. The latter thereupon filed a bill of interpleader in the Circuit Court of Morgan County, against Vail & Ladd, the Illinois River Railroad Company, the county of Morgan, Studwell, Hopkins, and Cobb (trustees in a mortgage executed Nov. 1, 1858, by the company to secure its bonds amounting to $1,020,000), R. S. Thomas (who held an acknowledged debt against the company of $16,502.24, payable out of any funds belonging to the company), and William Thomas, the holder of the two orders issued to Allen & McGrady.

By an interlocutory decree entered in that case, the bonds, after deducting $200 interest coupons for charges and solicitors' fees, were placed in the custody of Ayres & Co., to await the further order of the court. In that suit the county denied its liability upon the ground that no work had been done in Morgan County, and that by agreement between it and the company the latter was not entitled to the bonds except for work done by it in that county. The trustees named in the trust deed of 1858, in their answer, claimed that they were entitled to hold the bonds for the use and benefit of the Peoria, Pekin, and Jacksonville Railroad Company as the successor of the Illinois River Railroad Company, to be used by the former in the construction of the road in the county of Morgan, in accordance with the alleged agreement that they should be so used. Upon final hearing, the bills of all the parties interpleading were dismissed, but the court directed that the bonds remain in the custody of Ayres & Co. All the parties except the county of Morgan took an appeal to the Supreme Court, which held: *First*, That whether the bankers had notice or not of the certificate executed by R. S. Thomas, as president of the company, it showed an understanding, at least between the county and him, as to the use of the bonds for work to be done in Morgan County, and his claim, as a creditor, should not be allowed in violation of that understanding. *Second*, As to the claim of William Thomas, he was affected by the notice disclosed in the contract between Allen & McGrady, which provided for the payment of their claims by these bonds only for work done in Morgan County. *Third*, That the claims of Vail & Ladd stood upon an entirely

different footing; that they were creditors of the company for ties furnished, and had no notice of the condition upon which the bonds were issued; that they only knew that the county had subscribed to the stock and issued them; that any agreement or understanding between the company and the county, of which they had no knowledge, and the effect of which would be to place the bonds beyond their reach as creditors, would be fraudulent as to them; that the county subscription and the absolute order of the county court directing the issue and delivery of the bonds may have induced them to give credit to the company; that while, as against the president and Allen & McGrady, who had notice of the specific purpose for which the bonds were to be used, the county might insist that the delivery was qualified, it could not do so as to those creditors; that, " as to them, it cannot prove that the delivery was not as absolute as its records indicated; they had a right to regard the bonds as assets in the hands of the company." *Fourth*, The trustees, Studwell, Hopkins, and Cobb, having failed to assign errors, the court did not consider the propriety of the decree as to them. *Thomas et al.* v. *County of Morgan*, 39 Ill. 496.

Upon the return of that cause to the inferior State court a decree was entered (by consent of the creditors, Vail & Ladd, and the county) by which the county obtained possession of its bonds of the nominal value of $17,832.18, with coupons attached, in consideration of its paying off the judgments of Vail & Ladd, amounting to the sum already stated. The coupons alone exceeded in amount and value the debts of those creditors.

A suit in equity subsequently instituted by William Thomas, as the assignee of the orders issued in favor of Allen & Mc-Grady, raised the question as to whether he was not entitled to be paid out of the county bonds, inasmuch as the road had then been finally constructed in the county by the successors of the first company. It proceeded upon the ground that such construction, for all the purposes for which the stock was subscribed, was equivalent to a construction by the original company. He alleged in his bill that certain judgment creditors of the railroad company who had filed a bill in chancery in the

Morgan Circuit Court, made as defendants thereto only the Illinois River Railroad Company, the county of Morgan, and Ayres & Co., for the purpose of subjecting to those judgments the county bonds left in the custody of Ayres & Co. Although the complainants knew he was interested in the disposition of the bonds; that by an agreement between those creditors and the county, which was carried into decree by a collusive arrangement, the county, by paying only $6,000 in cash and about $6,000 in bonds in full satisfaction of the claims of those creditors, had received from Ayres & Co. $32,500 in nominal value of its bonds, with coupons attached (the latter alone exceeding the amount of the debts thus paid off), and had cancelled the same. To the bill a demurrer was interposed by the county, which being sustained, the bill was dismissed. Thomas appealed to the Supreme Court of Illinois. The case is reported as *Thomas* v. *County of Morgan*, 59 Ill. 479. The court in that case, speaking by Chief Justice Breese, said : —

"It is undeniable that the moving cause for the subscription, the real motive, was the construction of the road in Morgan County. It did not matter to the county by what particular agencies the road should be made, — it was sufficient that it was made. The stipulation must be construed with reference to its object and substance. The object was to secure the road in Morgan County. Had the company built the road out of its general assets, it is very certain they could have demanded the bonds. The sense of the stipulation is, not that these identical bonds shall pay for work done in Morgan County, but it is, if the work is done in the county the bonds shall be delivered. The fact that the road has been completed from Virginia to Jacksonville is a substantial performance of the condition upon which the bonds were issued; and the Allen & McGrady orders for $4,000 of them, drawn by the company, which have honestly come into the possession of the appellant, operated as an equitable transfer of so much of the county subscription from the railroad company to the appellant."

In another part of the opinion the court said : —

"Upon the theory that these bonds are a trust fund in the custody of the court, it is the duty of the court to see that it is

not wasted or misapplied, as the demurrer admits it has been, in the respects alleged in the bill of complaint.

" It is not denied that the parties prosecuting that suit agreed to receive from the county, in full satisfaction of their claims, the sum of $6,000 in cash and $6,360 of these bonds. There were then in the hands of the custodian, Ayres & Co., bonds of the nominal value of $32,500. These were surrendered, by the custodian, to the solicitor of the complainants in that action, in discharge of an indebtedness of only $12,360. This, without explanation, is a wasting and misappropriation of the fund, which a court of chancery can and ought to correct."

The decree was reversed, with directions to require an answer to the bill.

Upon the return of the cause the county filed an answer, claiming that its bonds had all been cancelled except those disposed of pursuant to the previous decrees of the court. That cause was consolidated subsequently with the suit of *Morgan County* v. *The Peoria, Pekin, & Jacksonville Railroad Company*, in which the county sought to recover from that company the possession of some of the bonds which had gone wrongfully, as claimed by the county, into its custody. From the final decree in that case the county prosecuted an appeal to the Supreme Court of Illinois. That case is reported as *Morgan County* v. *Thomas*, 76 Ill. 120. The court re-examined the grounds of the previous decisions, and, among other things, adjudged in that case —

*First*, That the claim of William Thomas should be sustained, not for the reason that the supposed condition upon which the bonds were placed in the custody of Elliott & Brown was performed, " but because no such condition, so far as the stockholders and creditors of the Illinois River Railroad Company, including Mr. Thomas, were concerned, ever existed. The subscription which the county court was authorized to make for capital stock in the Illinois River Railroad Company by the vote of the people, and the subsequent enactment of the legislature, was not conditional, but absolute, and the subscription made pursuant to this authority was unconditional. It was made prior to any issue of bonds, and when made, the contract between the county on the one side and the railroad company

on the other was complete.  The county was then legally bound to issue and deliver its bonds to the company in conformity with the terms of its subscription, and upon its doing so, the company was bound to deliver to the county the requisite certificate showing that it was the owner of the number of shares subscribed for in its capital stock.  This claim for unpaid subscription then became a part of the assets of the company.  Creditors might rely upon it for payment of their debts as implicitly as upon any other assets of the company, and this, too, although the company, subsequently to the making of the subscription, may have abandoned all proceedings under its charter, on account of its insolvency."

*Second*, " The subscription being absolute in its terms, and, therefore, constituting a part of the assets of the company, R. S. Thomas had no authority, simply as president of the company, to consent that it should become conditional; nor could the county make such claim as a matter of right."

*Third*, " The Peoria, Pekin, and Jacksonville Railroad Company acquired no claim to the Morgan County bonds at the sale under the deed of trust, because they were neither expressly nor by necessary implication included within its terms; " that " the bonds, then, remaining as assets of the Illinois River Railroad Company, could not have been donated by the county to the Peoria, Pekin, and Jacksonville Railroad Company.  Nor was it competent for the legislature, by enactment, to make such donation.  They were a trust fund, to be held for the payment of the debts of the company to which they belonged, and this, even if the failure of that corporation to exercise its corporate powers had worked its dissolution."

It thus appears that the county, by the payment of a little over $19,000 to certain creditors of the Illinois River Railroad Company, attempted, to the prejudice of other creditors, to discharge its own indebtedness to that insolvent corporation, represented by bonds of the nominal value of about $50,000, with coupons attached, the latter alone exceeding the claim of the particular creditors thus paid off.

In pursuance of authority conferred by its charter, the Illinois River Railroad Company conveyed, by way of mortgage,

dated Nov. 1, 1858, to Alexander Studwell, Lucius Hopkins, and George S. Cobb, as trustees, all of its corporate property, real and personal, franchises and effects, acquired and to be acquired, including all rents, issues, income, profits, moneys, rights, and advantages, derived and to be derived therefrom, in trust to secure the payment of one thousand three hundred and twenty bonds, aggregating the sum of $1,020,000, and payable in New York on the first day of January, 1880, with semi-annual interest at the rate of ten per cent per annum.

The deed provided that, if the company failed at any time to meet the annual interest on the bonds, all of them might be treated as matured obligations, and the mortgaged property, in that event, should be surrendered to the trustees, to be owned, operated, and held for the use and benefit of the holders of the bonds.

The company failed to pay the interest when due, after having constructed only the part of the road between Pekin, in Tazewell County, and Virginia, in Cass County. Its board of directors, at a meeting held on the 12th of July, 1862, ordered a surrender of the mortgaged property to the trustees. It then suspended all further operations, and ceased to discharge its functions. The trustees took possession by an agent, and, on the 17th of December, 1862, instituted a suit for foreclosure in the court below.

By an act of assembly passed June 11, 1863, Studwell, Hopkins, and Cobb, trustees, and Allen, Arnold, and Trowbridge, holders of the bonds secured by the deed of trust, and their associates, who should thereafter become purchasers of the mortgaged property under any decree of foreclosure, were constituted a corporation, under the name of the Peoria, Pekin, and Jacksonville Railroad Company, with power to purchase that property, and, upon receiving a proper transfer thereof, to have and be vested with all the corporate powers, privileges, immunities, and franchises theretofore given or granted to the Illinois River Railroad Company.

A final decree was rendered in the foreclosure suit, from which it appears that the principal and interest, then due and unpaid, of the bonds was $1,419,666. A sale thereunder was made on the 1st of October, 1863, to Allen, Arnold, and Trow-

bridge, at the price of $400,000, and was duly confirmed. A further decree was entered in June, 1864, against the company for the sum of $1,061,292.56, the balance then due upon the debt after crediting the proceeds of sale.

Shortly before the last decree the purchasers at the sale conveyed and transferred the railroad, franchises, and property of the company to the Peoria, Pekin, and Jacksonville Railroad Company, which thereafter completed the road from Virginia, in Cass County, to Jacksonville.

The present suit in equity was instituted by Allen, Arnold, and Trowbridge, the holders jointly of all the bonds secured by the trust deed, and, therefore, the equitable owners of the decree in the foreclosure suit, for the purpose mainly of subjecting to that decree such amount as was due from the county of Morgan upon its subscription, to the capital stock of the Illinois River Railroad Company. The bill proceeds upon the ground that the bonds issued for the subscription were a part of the assets of that corporation, constituting a trust fund to which its creditors could resort for the satisfaction of their debts. Before the commencement of this suit the county had obtained possession of and destroyed or cancelled its bonds. It denied all liability to the complainants, as creditors of the company, by reason of the alleged subscription, or upon any other ground. The complainants contended that the county obtained possession of the bonds in fraud of their rights as creditors of the company, and that, to the extent it had not, in fact, paid the amount due upon the bonds given for the subscription, but remained, notwithstanding their cancellation, liable to the creditors of the company. In that view the court concurred, and having ascertained through a master that there was due from the county, principal and interest, on its original subscription of $50,000 in bonds, the sum of $72,539.56, after allowing all payments theretofore made by it to creditors of the company, a decree was rendered in favor of the complainants for that amount. From that decree the present appeal is prosecuted by the county.

The case was argued by *Mr. William Brown* and *Mr. William M. Springer* for the appellant, and by *Mr. Washington H. Campbell* and *Mr. Henry S. Green* for the appellees.

MR. JUSTICE HARLAN, after making the foregoing statement of the case, delivered the opinion of the court.

The right of the creditors of the Illinois River Railroad Company to subject to the satisfaction of their claims the bonds issued by Morgan County for its subscription to the capital stock of the company has for many years been the subject of litigation in Illinois.

The preceding statement mentions the cases in her supreme court, where the history of that litigation will be found, and summarizes the essential facts which gave rise to it. They are numerous and complicated, and our labor in ascertaining them with accuracy has been greatly increased by the confused condition of the transcript.

We will notice such of the questions of law, suggested by the assignments of error, as we deem necessary to consider or determine.

1. In *Sawyer* v. *Hoag* (17 Wall. 610), we had occasion to consider the question whether the creditors of an insolvent corporation were at liberty to assail a transaction between it and its debtor, whereby his subscription of stock was withdrawn, so far as general creditors were concerned, from the assets of the corporation. In that case we declared the doctrine to be well established, that the capital stock of a corporation, especially its unpaid subscriptions, constitutes a trust fund, for the benefit of its general creditors, and that its governing officers cannot, by agreement or other transaction with the stockholder, release him from his obligation to pay, to the prejudice of its creditors, except by fair and honest dealing, and for a valuable consideration. In the subsequent case of *Sawyer* v. *Upton* (91 U. S. 56), we had occasion to consider the same question, and there said : " The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private copartnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied otherwise than upon their demands, until such demands are satisfied. The creditors have a lien upon it in equity. If diverted, they may follow it as far as it can be traced, and subject it to the payment of their claims, except

as against holders who have taken it *bona fide* for a valuable consideration and without notice. It is publicly pledged to those who deal with the corporation for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid in upon it. Creditors have the same right to look to it as to anything else, and the same right to insist upon its payment as upon the payment of any other debt due the company. As regards creditors, there is no distinction between such a demand and any other assets which may form a part of the property and effects of the corporation." The same doctrines are held in *Upton* v. *Tribilcock*, 91 U. S. 45; *Webster* v. *Upton*, id. 65; *Hatch* v. *Dana*, 101 id. 205. In no court have they been more distinctly approved than in the Supreme Court of Illinois, when considering the liability of the county of Morgan to creditors of the Illinois River Railroad Company arising out of these identical bonds. *Morgan County* v. *Thomas*, 76 Ill. 120.

These principles condemn the arrangements with certain creditors of the company, through which the county, to the prejudice of other creditors, attempted to discharge its liability to the common debtor by paying less than the entire sum due from it. The suits in the State court, under cover of which these arrangements were consummated, were all commenced after the decree of foreclosure, and after the company had suspended operations and was notoriously insolvent. The county recognized the dangers which beset the original enterprise, in furtherance of which its people had voted a subscription of stock payable in bonds. Its officers believed that it would inevitably fail, and that the ends expected to be accomplished by the aid voted would not be attained. It was, for these reasons, that they sought, or acceded to, an arrangement looking to the protection of the county against liability. But it is clear that other creditors besides those with whom it combined had an interest in the disposition of the assets of the company, and that the plan, as conceived and consummated, was wholly inconsistent with the established doctrines of equity. Upon recognized principles of public policy and good faith, the debt which the county owed, by reason of its subscription and the bonds given

therefor, constituted, with other property of the company, a trust fund, to which all its creditors could rightfully look for satisfaction of their claims. The county was liable for the whole ot that debt, and by no device or combination, to which particular creditors were parties, could it withdraw its bonds from that fund, and thereby avoid liability to the general creditors of the company.

Had the county's liability to the company rested upon its original subscription, the present case, it must be conceded, would come within the very letter of our decisions in the cases just cited. That the subscription was paid or merged in bonds can certainly make no difference in the application of the principle upon which those cases were determined. The bonds were the evidence of the debt created by the original subscription. The company had become, as all its creditors knew, wholly unable to meet its engagements, and had practically ceased to exist. The bonds in question were part of its assets, in which all the creditors had an interest. The county, by an arrangement with some of those creditors, attempted to lessen its obligation to pay what it had stipulated to pay, and thereby defeat the rights of other creditors, who had as much claim upon the assets of the company as those with whom the county contracted. What it did is utterly indefensible under any known rules of equity.

2. But it is contended that the subscription was without authority of law, and that, consequently, the county is not liable thereon, or upon the bonds. The specific ground upon which this contention rests is that the vote of the people in 1856 conferred no legal authority to make the subscription, such vote having been taken under an order of the county court submitting, as a single proposition, the question of subscribing $50,000 to the capital stock of three separate railroad companies, one of which was the Illinois River Railroad Company; that a vote upon such a proposition, submitted in that form, was not one upon which a municipal subscription could rest. There are two sufficient answers to this suggestion. One is, that in no one of the three cases in the Supreme Court of Illinois involving this subscription was any such question distinctly raised by the county. All of them proceeded manifestly upon the undis-

puted ground that the county court had ample power by statute to make the subscription. We are not now disposed to inquire whether the particular mode in which the people were invited to pass upon the proposed subscription affected the substance or validity of the subscription when made; or, whether the subscription was not a waiver of any irregularity in that respect. Until this suit was brought, more than fifteen years after the subscription had been made, the county never disputed, in any direct form, the legality of the order submitting the question of subscription. Another answer to this objection is suggested by the act of Jan. 29, 1857, declaring the vote to have been legally taken, and requiring a subscription and the issuing of bonds in accordance with the vote of the people. That act, it is argued, was beyond the power of the legislature to pass, in that, in violation of section 9 of article 5 of the Constitution of 1848, as construed by the Supreme Court of Illinois, it imposed upon the people of the county a debt which they had never legally voted to incur; that the vote in 1856, upon the proposition to subscribe stock in three distinct railroad corporations, was an absolute nullity, which could not be constitutionally remedied by any act of assembly, or otherwise than by a direct vote of the electors upon a new proposition submitted in legal form. In support of these views we are referred to numerous decisions of the State court, which we had occasion heretofore to examine in other cases. We deem it unnecessary to consider the general doctrine, with all its limitations and qualifications, of the power of the legislature, by retrospective enactments, to cure defects or omissions which occurred in elections relating to municipal subscriptions. It is often difficult to determine, as matter of local constitutional law, whether the defect or omission in a particular case involves a mere irregularity in the execution of a statutory power, or is vital and jurisdictional. It is quite sufficient on this point to say that the Supreme Court of the State, in *Thomas et al.* v. *County of Morgan* (39 Ill. 496), as well as in *Morgan County* v. *Thomas* (76 id. 120), recognized the act of the 29th of January, 1857, as having legalized the vote of the county. Those cases, in connection with *Thomas* v. *County of Morgan* (59 id. 479), are adjudications under which certain creditors of

the Illinois River Railroad Company have received payments of their claims out of the amount due from the county upon the bonds issued in payment of its subscription. The decrees in those cases could not have been rendered except upon the ground that the subscription was not invalid by reason of the particular mode in which the question of county aid was submitted to the electors.

3. It is further contended that the bonds were deposited with Elliott & Brown, to be delivered upon the condition, to which the railroad company assented, that they should be used only for the payment of work done in Morgan County; and, since no such work was done by that company, neither the latter nor its creditors can enforce liability upon the county.

Undoubtedly the county authorities, at the outset, expected that the bonds would be applied only upon such work, and there is no reason to suppose that the president of the company intended any application of them inconsistent with the paper which he executed and delivered to the county prior to their issue. The county court relied upon the assurances given by that officer, and made an order, at its September Term, 1857, that the bonds be delivered to the company. In conformity with that order the bonds were deposited with Elliott & Brown, the bankers of the company, and were held by them subject to its order. They in return received, for the county and by its direction, the certificate of stock. Subsequently, and after the bonds were issued and delivered to Elliott & Brown, the county voted as a stockholder in the election of directors, and for two years paid the interest on its bonds. During all that time who owned the bonds? We have already seen that the Supreme Court of the State adjudged, and, as we think, rightly, that the subscription was absolute and unconditional, and, when made, the company became entitled to the bonds, and the county to the stock. When the absolute subscription was made, the claim for its payment became, as was held by that court, a part of the assets of the company, upon which creditors could rely for the payment of their debts. While, as held by the State court, Thomas might bind himself to treat the subscription as conditional, he had no authority, simply as president of the company, " to consent that it should become conditional." The

present appellees, by their purchase of its mortgage bonds (about $900,000 of them purchased in April or May, 1862, and the remainder in 1868), became creditors of the company, and nothing is disclosed by the evidence which estops them from claiming, as against the county, that the bonds given for the county's unconditional subscription constituted, from, at least, the time of their issue and delivery to Elliott & Brown, a part of the assets of the company, to which the latter's creditors could look. Upon this very point the Supreme Court of the State expressed similar views, and said that "where a party receives property from another in discharge of precedent liability, and the party delivering the property has no legal right to prescribe its future disposition or use, as in the present instance, the mere fact that when he delivers it he expects and intends that it shall be applied to a particular disposition or use, does not make such an application of it a condition precedent to the vesting of title."

4. The objection that the appellees are concluded by the decree in the State court, under which the county obtained possession of its bonds, is not well taken. They were not parties to any of those suits, but it is contended that they are nevertheless bound by the adjudication upon the claim asserted therein by Studwell, Hopkins, and Cobb, in their capacity as trustees in the mortgage deed, that they were entitled to the possession of the bonds, for delivery to the new company in completion of the original contract with the county. The Supreme Court of the State was of opinion that the mortgage deed did not, by its terms, include these bonds; that the Peoria, Pekin, and Jacksonville Railroad Company was not a reorganization of the Illinois River Railroad Company, but a new and totally independent organization; and, therefore, the new company acquired no claim to the bonds at the sale under the deed of trust. 76 Ill. But if the trustees, after obtaining the decree of foreclosure and a sale of the mortgage property for the benefit of the bondholders, were under a duty, or by virtue of their position were authorized to enforce, for the benefit of those creditors, the collection of the decree against the company for the balance of the mortgage debt, it is manifest that they did not assume, in the suit in the State court, to

which they and the county were parties, to represent the bond-holders. In the suit commenced by Elliott & Brown, and reported in 39 Ill., they claimed the right to hold the bonds for the benefit of the new company, and not for the bond-holders, whose claims, after crediting the proceeds of the foreclosure sale, were unsatisfied to the extent of $1,061,292.56. Besides, the State court did not, in that case, decide that Morgan County was discharged altogether, and as to everybody, from responsibility upon the bonds, because of the failure of the old company to construct the road in that county. In the original decree it directed the bonds to remain in the custody of Ayres & Co. And in the case in 59 Ill. the court held that the construction of the road by the new company was a substantial compliance with the contract between the old company and the county. There was no adjudication, in the State court, against the claims of the present appellees. On the contrary, the grounds upon which the claims of Vail, Ladd, Thomas, Blair, and other creditors were adjudged by the Supreme Court of the State to be payable out of these bonds are the precise grounds upon which we sustain the claims of appellees as creditors of the old company.

5. In reference to the suit which, it is suggested, was instituted by Studwell, Hopkins, and Cobb in the Circuit Court of the United States for the Southern District of Illinois, it is sufficient to say that the present transcript contains nothing upon that subject. We are not advised, in any proper form, of the nature and object of that suit, nor who were parties to it. We cannot, therefore, say that the final decree in that case, if any was rendered, would affect the rights of parties in this litigation.

There are many other questions which counsel have discussed, but we do not regard them as material in determining the essential rights of the parties. We, therefore, refrain from any discussion of them. The decree below is in line with the adjudications of the Supreme Court of the State, and, in our judgment, is right.

While upon the bench MR. JUSTICE SWAYNE and MR. JUSTICE STRONG participated in the decision of this case. They concur in this opinion; and it is ordered that the judgment be

entered as of the date when this cause was submitted to this court.

*Decree affirmed.*

MR. JUSTICE MILLER, MR. JUSTICE FIELD, and MR. JUSTICE BRADLEY dissented.

NOTE. — A petition was filed for rehearing.

MR. JUSTICE HARLAN delivered the opinion of the court.

We do not perceive that the petition for rehearing in behalf of the county of Morgan contains any suggestion which was not pressed upon our attention in oral argument, as well as in the printed briefs heretofore filed. All that counsel said was carefully considered by us. But there were one or two matters, not distinctly covered by our opinion, to which we may properly refer. A rehearing is asked to the end that a complete record of the suit, in the Circuit Court of the United States for the Southern District of Illinois, of *Studwell,. Hopkins, and Cobb, Trustees,* v. *Morgan County, &c.,* may be obtained and embodied in the transcript of the present case. If the record of that case were here, it could be of no use to the county. The decree therein is not pleaded for any purpose. Further, it is apparent, as well from the printed arguments filed in this court, for and against the county, as from the testimony of the witnesses who refer to the case in the Circuit Court, that the suit of *Studwell, &c.* v. *Morgan County, &c.,* was dismissed *by the complainants therein, and that there was no adjudication upon the merits.* The decree of dismissal in that suit, therefore, concluded none of the parties to it, even were it conceded that the trustees had authority, in virtue of their position, to represent the present appellees in any litigation with Morgan County touching its liability to creditors of the Illinois River Railroad Company.

We did not, as counsel seem to suppose, overlook the argument based upon the subscription made by the city of Jacksonville. That subscription, as matter of law, was wholly disconnected from the subscription made by the county, and we could not regard the former as payment, in whole or in part, of the latter, without assuming to make for the parties a contract which they did not choose to make for themselves. If, as urged, that the result is unfortunate for the county, we can only say, what cannot be too often repeated, that hard cases cannot be permitted to make bad law.

*Petition denied.*

*Allen* v. *County of Morgan,* appeal from the same decree, was argued by the counsel who appeared in the preceding case. MR. JUSTICE HARLAN remarked, in giving the opinion of the court, that no error was perceived in the record to the substantial prejudice of the appellants. The decree below was therefore

*Affirmed.*

MR. JUSTICE MILLER, MR. JUSTICE FIELD, and MR. JUSTICE BRADLEY dissented.